Gail M. ARMSTRONG, Plaintiff,

v.

**LOCKHEED MARTIN BERYLLIUM CORPORATION, a Delaware corporation, f/k/a Loral American Beryllium Corporation, a Delaware corporation, Defendant.**

No. 96–1456–CIV–T–17E.

United States District Court, M.D. Florida, Tampa Division.

Dec. 12, 1997.

Alex Lancaster, Amy L. Sergent, Lancaster & Eure, Sarasota, FL, for Gail M. Armstrong, plaintiff.

Daniel H. Kunkel, Kunkel, Miller & Hament, Sarasota, FL, for Lockheed Martin Beryllium Corporation, defendant.

## ORDER

McCOUN, United States Magistrate Judge.

THIS MATTER is before the court on **Defendant's Motion For Summary Judgment and/or Dismissal** (Doc. 27) and supporting memorandum of law (Doc. 28). Plaintiff filed a response in opposition (Doc. 36). By its motion, Defendant seeks summary judgment on Plaintiff's claims of disability discrimination brought pursuant to the Americans with Disabilities Act of 1990 (hereinafter "ADA"), 42 U.S.C. §§ 12112, et seq., and 42 U.S.C. §§ 2000e, et seq. (Counts I and II), and the Florida Civil Rights Act of 1992 (hereinafter "FCRA"), Fla. Stat. ch. 760.01, et seq. (1995) (Count III).

Defendant argues first that Plaintiff's state law claim, Count III, is barred because Plaintiff failed to exhaust her administrative remedies. Specifically, Defendant contends that Plaintiff did not dual file her Equal Employment Opportunity Commission (hereinafter "EEOC") charge of discrimination with the Florida Commission on Human Relations (hereinafter "Florida Commission"), and that she did not wait for expiration of 180 days before requesting and receiving a right to sue letter from the EEOC, thereby terminating the administrative investigation.

Defendant argues that Plaintiff also failed to exhaust her administrative remedies with respect to the ADA claims, Counts I and II, because they exceed the scope of her EEOC charge. As additional grounds for summary judgment and/or dismissal, Defendant argues that Plaintiff cannot establish a prima facie case because Plaintiff was not a qualified individual with a disability as defined by the statute. Defendant further contends that, even if Plaintiff's demands for accommodation were reasonable, Plaintiff cannot refute Defendant's undue hardship defense. Finally, Defendant claims that the Plaintiff's damages are limited as a matter of law.

### I.

In its motion, Defendant sets forth a lengthy "Statement of the Undisputed

Facts." (Doc. 27, at 3–25). In her response, Plaintiff, "for the most part," adopts Defendant's factual allegations, but objects to "inaccuracies" with respect to three areas of contention: the assignment of answering operator calls to other workers and the economic feasibility for the Company to hire another administrative employee to answer operator calls; when Plaintiff informed Loral of her medical condition; and the life activities affected by her condition.[1]

The undisputed facts show that Plaintiff, Gail M. Armstrong, was employed by Loral American (hereinafter "Loral") on a full-time, permanent basis as an engineering clerk in late 1980. During the early 1990s, as a result of downsizing in the company, Plaintiff's duties were expanded to include the following duties: accounts payable clerical duties, accounts receivable clerical duties, entering customer purchase orders, sorting company mail, entering and recording customer blue prints, and answering operator calls on a rotating basis.

Loral laid off its switchboard operator/receptionist during downsizing and subsequently installed a voice mail system. When a caller using the system dialed zero for operator assistance, a loud bell would ring over the paging system indicating an "operator call" to be answered. Plaintiff and other clerical workers were each scheduled to answer operator calls from their desks one-half day per week and to back up the person assigned to answer calls the rest of the day. Plaintiff claims that answering operator calls made her nervous and anxious because the bell rang loudly and the calls would distract her from her regular duties.

Plaintiff was first diagnosed with a mental illness in November 1993.[2] She has been treated continuously by Dr. Barbara Por Srur since that time. Plaintiff also began consulting Roger Rowe, a mental health counselor referred by Dr. Srur, in November 1994.

In or about March 1995, Plaintiff asked General Manager Stan Bell if she could move two accounting files to her office to reduce the stress caused by running to and from opposite ends of the building, but her request was denied. By October 1995, Plaintiff requested assistance with the increased workload.

On October 24, 1995, Plaintiff requested a two-week leave of absence, supported by a letter from Dr. Srur. The request was granted,[3] and Plaintiff did not work until January 3, 1996, when she returned to work with a letter from Dr. Srur that released her to work with restrictions to accommodate her illness, including a restriction that Plaintiff should not be required to answer operator calls. After reviewing the letter and discussing the restrictions with Plaintiff, Langenbach and Human Resources Manager Vicki Derreberry advised Plaintiff that she would not be permitted to work until she was able

1. Plaintiff denies Defendant's allegation in Paragraph 14 of Defendant's statement of facts, wherein Defendant alleges that there were not enough workers who could be assigned the duty of answering calls and that the company could not hire another administrative employee to answer calls. In Paragraphs 16 and 17, Defendant contends that Plaintiff's diagnoses of mental illness were not communicated to Loral. Plaintiff states that she did inform Loral of her condition through her supervisor, Bob Langenbach, in the Spring or Summer of 1995. Plaintiff also disputes Defendant's assertions in Paragraph 66, which states that Dr. Srur identified only sleep as a major life activity affected by her condition. Plaintiff asserts that Dr. Srur also identified a diminished ability to think or concentrate, and to function in the work environment when there is a high level of stress. (Doc. 36, at 1–2).

2. Dr. Srur and Rowe both diagnosed Plaintiff with depression, dysthymia, and anxiety. Their findings were inconsistent, however, as to the onset and duration of her conditions.

3. During this absence, Plaintiff had voluntarily committed herself into a hospital for a week because she was suicidal, and then she attended an out-patient program for another week. Loral was unaware of Plaintiff's hospitalization. On November 27, 1995, Plaintiff went to work to move some of her personal belongings because Loral had placed a newspaper advertisement for a permanent accounting clerk. At that time, Plaintiff informed Langenbach that she anticipated being able to return to work on January 2, 1996.

to do so without restrictions. On February 2, 1996, Plaintiff sent a letter to Loral American requesting accommodation and claiming that she had a disability of major depression.

On February 8, 1996, Plaintiff attended an independent medical examination with Dr. James Slocum, a doctor provided by Defendant's insurance carrier. After a one-time evaluation of Plaintiff, Dr. Slocum released Plaintiff to return to work without restrictions.

Plaintiff returned to work on February 26, 1996. Because Defendant had hired another engineering clerk, Connie Hardesty, Defendant placed Plaintiff in a production control clerk position, which still required Plaintiff to answer operator calls one-half day per week. The next day, Plaintiff wrote a memo requesting the accommodation of not having to answer operator calls. This request was supported by a letter faxed by Dr. Srur on February 28, 1996, which stated that plaintiff was on medication for anxiety and answering operator calls exacerbated her condition.

On March 6, 1996, Plaintiff was assigned to answer operator calls and again refused to answer the calls, explaining that she was unable to do so. Derreberry sent Plaintiff home and invited her to return to work the next day. Later that day, Dr. Srur called Derreberry and again stated that answering the operator calls caused Plaintiff anxiety.

On March 12, 1996, Derreberry and General Manager Bell met with Plaintiff and gave her a written warning that continued refusal to answer operator calls would be viewed as insubordination and handled in accordance with company procedures. The following day, Plaintiff again refused to answer the operator calls, and Loral terminated Plaintiff's employment.

On or about January 8, 1996, Plaintiff filed a charge of discrimination with the EEOC alleging she was terminated or "effectively terminated" by reason of her disability and discrimination by reason of a failure to provide reasonable accommodations. On the charge form, the Plaintiff did not check the box requesting that the charge be dual filed.

On July 25, 1996, Plaintiff brought this disability discrimination action pursuant to the ADA and the FCRA. Plaintiff alleges that Loral American's refusal to accommodate her disability and subsequent termination of her employment constituted disability discrimination. Defendant moves for summary judgment on all claims.

## II.

The court shall grant summary judgment for the moving party only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court may look to "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," in determining whether summary judgment is appropriate. *Id.*. The movant bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hairston v. Gainesville Sun Publ. Co.,* 9 F.3d 913, 918 (11th Cir.1993); *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983).

Once the moving party satisfies its burden, the burden shifts to the non-moving party to establish the existence of a genuine issue of material fact. *Celotex,* 477 U.S. at 324; *Howard v. BP Oil Company, Inc.,* 32 F.3d 520, 524 (11th Cir.1994). The nonmovant must designate specific facts showing a genuine issue for trial beyond mere allegations or the party's perception of discrimination. *See Perkins v. School Bd. of Pinellas County,* 902 F.Supp. 1503 (M.D.Fla.1995). He or she must set forth by affidavit or other appropriate means specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). Because evidence of a genuine issue of material fact must be such that a reasonable jury could return a verdict for the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hairston,* 9 F.3d at 919, only *reasonable* doubts as to the existence of genuine

facts may be considered, *Browning v. Peyton*, 918 F.2d 1516, 1520 (11th Cir.1990). It is the substantive law that identifies those facts which are material. *Anderson*, 477 U.S. at 248.

When deciding a motion for summary judgment, "[i]t is not part of the court's function ... to decide issues of material fact, but rather [it is to] determine whether such issues exist to be tried ..." and "[t]he court must avoid weighing conflicting evidence or making credibility determinations." *Hairston*, 9 F.3d at 919 (citing *Anderson*, 477 U.S. at 242). The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried. *Hairston*, 9 F.3d at 921; *Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987). All the evidence and the inferences from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir.1990). In the case of an employment discrimination claim, which often requires ascribing motive or intent to a party, the Eleventh Circuit has expressed some hesitation in granting summary judgment. *See, e.g., Hairston*, 9 F.3d at 919; *Batey v. Stone*, 24 F.3d 1330 (11th Cir.1994).

## III.

### A.

■ Defendant first argues that Count III, Plaintiff's claim under the FCRA, should be barred because Plaintiff failed to exhaust her administrative remedies. In order to file suit under the FCRA, a plaintiff must first exhaust her administrative remedies by filing a charge with the Florida Commission. Fla. Stat. ch. 760.11(1); *Williams v. Eckerd Family Youth Alternative*, 908 F.Supp. 908, 910 (M.D.Fla.1995); *Thompson v. Xerox Corp.*, 1991 WL 119114, at *2 (M.D.Fla. April 3, 1991).

Plaintiff's charge of discrimination was filed with the EEOC on January 17, 1996. Because of a workshare agreement between the EEOC and the Florida Commission, the agencies treat the charge as dual filed in such circumstances. Nevertheless, the Defendant contends that Plaintiff failed to file her charge with the Florida Commission because she failed to check the box used to indicate a request for such dual filing.

Defendant also contends that Plaintiff's request for a right to sue letter within 180 days of filing the charge requires the dismissal of the state charge upon the authority of *Ayers v. Wal–Mart Stores, Inc.*, 941 F.Supp. 1163 (M.D.Fla.1996).

In response, Plaintiff relies upon an affidavit of Nate Washington, an intake coordinator with the Florida Commission, as well as this court's holding in *Nichols v. Wal–Mart Stores, Inc.*, 958 F.Supp. 583 (M.D.Fla.1997). According to the Washington affidavit, Plaintiff's charge of discrimination was considered dual filed as of the date it was filed with the EEOC. By the workshare agreement, the investigation was intended to be performed by the EEOC. The affidavit suggests that the Florida Commission accepts the decision by the EEOC.[4]

As suggested by a review of the caselaw, the agency regulations, and the workshare

---

4. The affidavit does not address the impact of the EEOC's issuance of a right to sue letter in lieu of an investigation. In *Ayers*, the court found that such a procedure defeated Florida's administrative scheme and required a dismissal of the state claim for failure to exhaust where plaintiff filed suit within the 180–day period. The affidavit does not clarify how the Florida Commission views the issuance of a right to sue letter, although it suggests that the Commission views it as an acceptable resolution of the administrative process. If this is so, it is troubling to the court in light of the different administrative schemes.

As noted above, the court does not believe that the mere issuance of a right to sue letter within the 180–day term defeats Florida's administrative scheme or requires the dismissal of the state charge. However, if the Florida Commission accepts the right to sue procedure as terminating its inquiry, it avoids its responsibilities under the Florida scheme and may jeopardize the complainant's rights to pursue legal remedies further. In this court's view, the Commission needs to further clarify its position.

agreement between the EEOC and the Florida Commission, this is an area of confusion, if not outright disagreement. Florida's administrative scheme differs from the federal scheme. *See Ayers,* 941 F.Supp. at 1166–67. While the issuance of a right to sue letter is acceptable to conclude the federal process, it does not neatly fit into the state administrative scheme. This court's view, as expressed in *Nichols, supra,* is that the issuance of a federal right to sue letter within the 180–day period after filing the complaint does not automatically defeat or thwart the state administrative process, nor does it automatically terminate a complainant's right to bring a state claim as long as the claimant allows the Florida Commission the full 180 days to conduct whatever investigation it chooses to conduct. *Nichols,* 958 F.Supp. at 585. However, as discussed below, this view does not salvage the Plaintiff's claim in this instance.

Under both state and federal law, the burden is upon the complainant to exhaust the administrative process before bringing suit. At the outset of any claim, the complainant has the choice of initiating a federal claim, a state claim, or both. The process is relatively simple in Florida, and by reason of the aforementioned workshare agreement, both a federal and a state claim may be initiated by the filing of a single form charge of discrimination which identifies both the EEOC and the Florida Commission and which affirmatively indicates an intention to proceed before both agencies. In this court's view, regardless of the workshare agreement, to initiate the administrative process of both agencies effectively, the complainant must affirmatively indicate the intention to do so, and the failure of the Plaintiff to do so here is fatal to her state claim in Count III.[5]

In this court's view, the conclusion is not altered in this case because the Florida Commission actually received the charge on June 10, 1996. In other words, on the facts of this case, the submission of the charge by the EEOC does not forgive the Plaintiff's failure to request such filing. Absent dual filing, the Florida Commission had 180 days from its receipt of the charge to conduct its own investigation. Here the Plaintiff did not wait the prescribed period before filing suit in July 1996.

For these reasons, Defendant's motion is granted as to Count III, which is hereby dismissed.

### B.

Defendant also asserts that Plaintiff failed to exhaust her administrative remedies because her ADA claims exceed the scope of the EEOC charge of discrimination. The Eleventh Circuit has defined the scope of an EEOC complaint to "encompass[] any kind of discrimination like or related to allegations contained in the charge and growing out of such allegation during the pendency of the case before the commission." *Turner v. Orr,* 804 F.2d 1223, 1226 (11th Cir.1986) (citing *Sanchez v. Standard Brands Inc.,* 431 F.2d 455, 466 (5th Cir.1970)). *See also Evans v. U.S. Pipe Foundry Co.,* 696 F.2d 925, 929 (11th Cir.1983); *Fowler v. Taco Viva, Inc.,* 646 F.Supp. 152, 157 (S.D.Fla.1986). "[T]he 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Turner,* 804 F.2d at 1226. If additional charges in the civil complaint arise naturally and logically from the facts presented to the EEOC, they are related to the original charge. *Brown v. Walt Disney World Co.,* 805 F.Supp. 1554, 1558–59 (M.D.Fla.1992).

Defendant contends that Plaintiff's claims, as they allege violations occurring on October 24, 1995, and/or January 3, 1996, are the only claims within the scope of her EEOC charge, since these dates were indicated as the "Date

---

5. This court declines to presume that the Plaintiff here intended to dual file. For any number of reasons, a complainant might not wish to proceed before two agencies or under differing statutes. Even if the agencies process the claim according to their workshare agreement, the conclusion is no different. Unless the complainant affirmatively indicates that the claim is to be dual filed, she may only proceed before the agency that actually receives the charge.

Most Recent or Continuing Discrimination Took Place" in Plaintiff's EEOC charge. Defendant also argues that the Plaintiff's claims of discrimination in violation of the ADA exceed her charge because Plaintiff did not assert explicitly in her charge that any discrimination was based on a record of disability or because she was perceived as disabled. Plaintiff's charge states only that she was "terminated, or effectively terminated, or not allowed to return to work, unless [she had] no disability" and that this action occurred "because [she had] a disability and requested accommodation."

Defendant's claims are without merit. Plaintiff's claims grew out of the allegations during the pendency of the case before the commission. Her charge alleged that she was effectively discharged by reason of her disability and a failure to accommodate it. While the charges could have been better stated, they are adequate to encompass the better pleaded allegations of her lawsuit.

The ADA defines "disability" as "a physical or mental impairment that substantially limits the major life activities of such individual; a record of such impairment, or being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C); 29 C.F.R. § 1630.2(g)-(h). The scope of EEOC's investigation into Plaintiff's claim of disability could reasonably be expected to include inquiry into the nature of Plaintiff's claimed disability, whether actual, perceived, or recorded. Furthermore, while Plaintiff's charge specifies October 24, 1995, and January 3, 1996, as dates on which discrimination most recently or continued to occur, her allegations that she was terminated, or effectively terminated, or not allowed to return to work, unless she had no disability, or because she had a disability and was denied reasonable accommodation, support her claim of a continuing violation up to her actual termination. This court disagrees that Plaintiff was required to file another charge after her actual termination in March 1996.

Contrary to Defendant's contentions, Plaintiff's claims of employment discrimination do not exceed the scope of Plaintiff's initial charge of discrimination. Plaintiff exhausted her administrative remedies prior to filing her ADA claim, and therefore Defendant is not entitled to summary judgment on this ground.

## IV.

■ Defendant argues that Plaintiff has failed to establish a prima facie case of discrimination under the ADA. To establish a prima facie case, Plaintiff must establish the following elements: (1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to discrimination because of her disability. *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir.1997); *Morisky v. Broward County*, 80 F.3d 445, 447 (11th Cir.1996); *Pinkerton v. The City of Tampa, Florida*, 981 F.Supp. 1455, 1456 (M.D.Fla. 1997). Specifically, Defendant contends that Plaintiff has failed to demonstrate that she was "disabled" within the meaning of the ADA. In addition, Defendant asserts that answering operator calls was an essential function of Plaintiff's position, and, therefore, Plaintiff's inability to perform this function rendered her not "qualified" for the position. These contentions raise genuine issues of material fact that preclude summary judgment in the instant case.

The ADA defines "disability" as a physical or mental impairment that substantially limits one or more major life activities, a record of such impairment, or being regarded as having such an impairment. 42 U.S.C. § 12102(2)(A)-(C); 29 C.F.R. § 1630.2(g)-(h). A "mental impairment" refers to "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i).

The record clearly reflects that Plaintiff suffered from mental impairment during the her employment at Loral. It is not appar-

ent, however, to what extent her impairment limited her ability to work or perform any other major life activities. As reflected in her deposition, Dr. Srur found that Plaintiff's mental condition affected her ability to work. (Deposition of Barbara Por Sur, M.D., Doc. 27, Exhibit H). Defendant, while conceding that Plaintiff was not able to work from October 24, 1995, to January 3, 1996 (Doc. 28, at 15), contends that Plaintiff's impairment did not limit her ability to perform any major life activities prior to or after that period. To support this latter contention, Defendant offers evidence that Dr. Slocum gave Plaintiff a full release to work without restrictions after February 8, 1997. (Deposition of James L. Slocum, M.D., Doc. 27, Exhibit K, at 14).

The medical records and correspondence of Dr. Srur arguably provide evidence that Plaintiff had a record of disability as required by the ADA. However, it is disputed when Defendant was first put on notice that Plaintiff had a disability, whether Defendant regarded Plaintiff as disabled, or whether Defendant relied on Plaintiff's disability record in making its employment decisions. Defendant contends that Plaintiff never provided it with any evidence or reason to believe that her depression substantially limited any major life activities prior to her termination on March 13, 1996. Plaintiff has, however, presented some evidence that Loral was arguably aware of her condition as early as Spring of 1995, when she complained about her medical problems to Bob Langenbach, or October 1995, when she requested medical leave from Vicki Derreberry. In addition, Defendant has already acknowledged as undisputed that Plaintiff could not work because of her condition from October 24, 1995, to January 3, 1996. (See, Doc. 28, at 15). Aside from this period, it is unclear from the record whether Loral regarded Plaintiff as disabled under the ADA or whether Loral relied on Plaintiff's disability record in making its employment decisions. Numerous factual disputes remain at issue.

Assuming, *arguendo*, that Plaintiff was "disabled" as defined by the ADA, Defendant contends that Plaintiff has failed to prove that she was a "qualified" individual with a disability. 42 U.S.C. § 12102(8), 29 C.F.R. § 1630.2(m-o). Defendant argues that answering operator calls was an essential function of Plaintiff's position due to downsizing of the company. To refute this claim, Plaintiff has offered the testimony of William Safron, an employee of Kelly Services who was assigned to work in Loral's engineering department from October 1995 to February 1996. According to Safron, he performed duties normally assigned to Plaintiff, but he was "not asked to perform switchboard duties and was told that this was not essential to the job." (See William P. Safron Affidavit, Doc. 36, Exhibit 1, at ¶¶ 1–3). In a light most favorable to Plaintiff, the nonmoving party, factual disputes exist as to whether answering operator calls was an essential function of Plaintiff's position and whether Defendant denied her reasonable accommodation by not allowing her to work unless she answered operator calls. These genuine issues of material fact preclude summary judgment on Plaintiff's ADA claims.

### V.

■ Finally, Defendants seek to limit Plaintiffs damages on the grounds that Lockheed Martin Beryllium Corporation, as an innocent successor corporation, purchased Loral American shortly after Plaintiff's termination, and that Lockheed shut down the local business location in September 1996. Defendant has presented evidence to demonstrate that Plaintiff would not have been eligible for a recall after layoff or for a transfer to another location. According to the affidavits of Stephen F. Wahl, Senior Vice President and General Counsel for Lockheed Martin, all nonmanagerial employees at the former Loral factory were permanently laid off on September 27, 1996. Likewise, Plaintiff would have been laid off without opportunity to be recalled or be transferred to another location. (Affidavits of Stephen F. Wahl, Doc. 27, Exhibit M; Doc. 45). Plaintiff offers no contrary evi-

dence.[6] As a matter of law, this court finds that Plaintiff is not entitled to an award of damages for back pay or lost benefits subsequent to September 27, 1996, nor is she entitled to an award of front pay.

Defendants also seek summary judgment on Plaintiff's claims for compensatory and punitive damages on the ground that such damages may not be awarded against an innocent successor corporation.[7] Defendant cites to *Musikiwamba v. ESSI, Inc.*, 760 F.2d 740 (7th Cir.1985), as an example supporting this proposition. In *Musikiwamba,* the Seventh Circuit held that successorship liability may be applied in employment discrimination claims brought under § 1981. *Id.* at 744, 748–49. However, in dicta, the court noted that successor liability for punitive and compensatory damages in § 1981 cases "go far beyond" the purpose of granting remedial relief to an employee who is unable to obtain similar relief from the predecessor, thus suggesting no right to claim such damages against a successor.

The court finds limited case law on this issue and none directly on point.[8] In the context of a labor dispute, the United States Supreme Court has suggested a balancing approach to resolving successor liability issues. In *Golden State Bottling Co. v. NLRB,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973), the Court suggested a balancing of the conflicting interests between the successor, the public, and the affected employee. In that decision, the Court reasoned that where the employer acquires the assets of a predecessor and continues the business with knowledge of the impending claim, it can be required to remedy the predecessor's unfair labor practices. Adopting this approach, and given that Title VII allows for an award of compensatory damages designed to make the employee whole, it appears correct to conclude that the successor's liability could include an amount for compensatory damages in addition to backpay.[9] Thus, the court will not grant summary judgment on this ground. It may be appropriate to limit such damages to the same time frame as backpay. The court will allow additional argument at trial on this point.

## VI.

Accordingly, it is **ORDERED** that **Defendant's Motion For Summary Judgment and/or Dismissal** (Doc. 27), is **PARTIALLY GRANTED** with respect to Count III and to the extent that Plaintiff is not entitled to an award of back pay subsequent to September 27, 1996, to front pay, or to punitive damages. In all other respects, the motion is **DENIED.**

---

6. At arguments, counsel for Plaintiff conceded this issue.

7. The Defendant does not argue that it has no liability for any claim on a theory of successor liability, only that the Plaintiff may not recover compensatory or punitive damages against it on this theory.

8. The *Musikiwamba* court considered the issue at a time when there were no compensatory or punitive damages under Title VII at all. Such is not the situation now. The addition of these potential damages in an employment discrimination case suggests a "make-whole" purpose not found to exist by the Seventh Circuit in its decision. *See Musikiwamba*, 760 F.2d at 748. Thus this decision offers only persuasive dicta on the issue presented.

9. Under no circumstances can this court envision the imposition of punitive damages liability against an innocent successor. The conflicting interests of the parties and policies justifying successor liability and punitive damages all militate in favor of the successor company on such a claim. To this extent, the Defendant's motion is granted.