**Jimmie Dean STILLWELL, Plaintiff,**

v.

**KANSAS CITY, MISSOURI BOARD OF POLICE COMMISSIONERS, et al., Defendants.**

No. 94–1003–CV–W–1.

United States District Court, W.D. Missouri, Western Division.

Jan. 5, 1995.

Julianne Carter, Jolley, Walsh, Hager, Kansas City, MO, for plaintiff.

Dale H. Close, Kansas City Police Legal Advisor, Kansas City, MO, for defendants.

## ORDER

WHIPPLE, District Judge.

Pending before the Court is Plaintiff's motion for partial summary judgment. Said motion together with Plaintiff's suggestions in support, Defendants' suggestions in opposition, Plaintiff's reply suggestions, and all accompanying exhibits were reviewed by the Court. After due consideration of the above, for the reasons set forth below, the motion is granted.

## I. BACKGROUND

Plaintiff was born without a left hand. In 1974, Plaintiff was licensed and registered with the Kansas City Police Department as a private security guard with authority to carry a firearm. Subsequent to that time, a state regulation was passed that requires an individual to meet the physical requirements and qualifications of a Kansas City, Missouri police officer before being licensed as an armed security guard. 17 C.S.R. § 10. From 1976 to the present Plaintiff has been licensed as an unarmed private security guard. In 1992, Plaintiff reapplied for licensing as an armed security guard. Plaintiff's application was denied by the Kansas City, Missouri Board of Police Commissioners (the "Board"). A second request was also denied.

Defendants denied Plaintiff's license application because they assumed that with only one hand he cannot perform the full and unrestricted duties required of a police officer. Specifically, Defendants assert that two hands are required to successfully perform defensive tactics such as handgun retention, lateral vascular neck restraint, knife defense, and handcuffing. Defendants also allege that a one-handed guard with a gun is more likely to use deadly force on another person than a guard with two hands.

Contrary to Defendants' position, Plaintiff asserts that he is able to perform the full and unrestricted duties of a police officer in that he is able to detain suspects and safely operate firearms. In May 1993, Plaintiff successfully completed the 120–hour Basic Law Enforcement Course at the University of Missouri. Under the Board's licensing scheme he was not given the opportunity to demonstrate his physical abilities. Plaintiff asserts that the Board's blanket prohibition on all one-handed applicants constitutes unlawful discrimination on the basis of disability in violation of Title II, the public entity provision, of the Americans with Disabilities Act ("ADA"). 42 U.S.C. §§ 12131–12165.

Plaintiff seeks the following relief: 1) a declaratory judgment that the Board's licensing scheme violates the ADA; 2) an injunction prohibiting the Board from engaging in practices that discriminate on the basis of disability; 3) an Order requiring Defendants to issue Plaintiff an armed security guard license; and 4) actual, compensatory and other damages. Plaintiff also submits claims for relief under Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; and the Missouri Human Rights Act, § 213.010 Mo.Rev.Stat. (1986). However, Plaintiff seeks partial summary judgment only on his ADA claims.

## II. STANDARD FOR SUMMARY JUDGMENT

A movant is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56(c), "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Aetna Life Insurance Co. v. Great National Corp.*, 818 F.2d 19, 20 (8th Cir.1987). The moving party bears the burden of proof. When considering a motion for summary judgment, the court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991) (citation omitted).

Once the moving party discharges this initial burden, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Federal Rule of Civil Procedure 56(e). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To establish a genuine issue of fact sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Supreme Court encouraged the use of summary judgment in appropriate cases: "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, 106 S.Ct. at 2555 (citations omitted). *See also, City of Mt. Pleasant v. Associated Elec. Coop. Inc.*, 838 F.2d 268, 273 (8th Cir.1988) ("The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, free courts' trial time for those cases that really do raise genuine issues of material fact.").

## III. DISCUSSION

Title II of the ADA provides that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity...." 42 U.S.C. § 12132. Therefore, to establish a violation of Title II a plaintiff must show: 1) that he or she is a qualified individual with a disability; 2) that a public entity discriminated against him or her on the basis of that disability; and 3) that he or she has been excluded from participation in or been denied the benefits of the services, programs, or activities of a public entity. The Court will analyze these three factors in reverse order.

### A. Denied Benefits or Services of a Public Entity

It is not disputed that the Board is a public entity within the meaning of the ADA. Moreover, Plaintiff has amply demonstrated that he has been excluded from participation in the programs or activities of the Board. Defendants concede that Plaintiff was twice denied the benefit of receiving a license as an armed security guard. As an armed security guard, Plaintiff asserts that he can earn an additional $4 to $5 an hour. This increased earning potential is directly tied to the licensing decision of a public entity.

### B. Discrimination on the Basis of a Disability

The applicable federal regulations prohibit public entities from administering "a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination on the basis of disability ..." 28 C.F.R. § 35.130(b)(6). In spite of this admonition, Defendants acknowledge that the Board has "made the determination that an impairment of the type Plaintiff has

would automatically disqualify the Plaintiff as being a safety risk to himself and others and would result in a lowering of standards of private security personnel." *Defendants' Suggestions*, at 10. The issue is whether the Board's blanket prohibition on all one-handed license applicants constitutes "discrimination." Clearly it does.

The Board freely admits that every applicant with only one hand is rejected. Simply rejecting an applicant based on the number of hands he or she has acts as a screening device that discriminates against potentially qualified individuals with disabilities. The Board cannot credibly claim that awarding licenses to one-handed applicants will lower safety standards because the Board has never examined Plaintiff or allowed him to demonstrate his physical abilities. The Board's broad-sweeping rejection is based solely on an impermissible stereotype. There is also no suggestion that reasonably accommodating an applicant such as Plaintiff would fundamentally alter the nature of the licensing program. The Board must formulate procedures to consider applicants based on their individual attributes.

### C. "Qualified Individual with a Disability"

#### 1. "Disability"

■ In analyzing this factor, the Court must first determine if Plaintiff has a disability. The applicable regulations under Title II of the ADA define "disability," with respect to an individual, as: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual; a record of such impairment; or being regarded as having such an impairment." 28 C.F.R. § 35.104. The regulations go on to define a physical impairment as "any physiological disorder or condition, cosmetic disfigurement, or *anatomical loss* affecting one or more of the ... body systems." 28 C.F.R. § 35.104 (emphasis added). Plaintiff fits within this definition because he has suffered the anatomical loss of his left hand.

The Court must next determine if Plaintiff's physical impairment "substantially limits" one or more of his "major life activities."

The appendix to the regulations states that an individual is considered disabled when his or her "important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people." 28 C.F.R. § 35.104, Appendix A, at 443–44. Plaintiff states that due to the loss of his left hand he has always had to adjust the way he performs manual tasks in comparison to most people. This stands to reason. Plaintiff also had to modify some of the techniques he learned at the University of Missouri's Basic Law Enforcement Course to accommodate his having only one hand. *Affidavit of Charles J. Craig*, at 2. Based on the above, the Court finds that Plaintiff has a "disability" as defined by the ADA.

Defendants rely on *Bolton v. Scrivner*, 36 F.3d 939, 943 (10th Cir.1994), in asserting that Plaintiff is not disabled because his anatomical loss does not substantially limit him in the major life activity of "working." This may be true. However, Plaintiff does not assert that his ability to work has been impaired. Such an analysis is germane only to Title I, the employment provision, of the ADA. The relevant statutory provision at issue in this case is Title II of the ADA, which covers discrimination by public entities.

#### 2. "Qualified"

Determining whether Plaintiff is "qualified" is the pivotal issue in this case. A person is a "qualified" individual with a disability with respect to licensing if he or she, with or without reasonable modifications, "meets the essential eligibility requirements" for receiving the license. 28 C.F.R. § 35.104. Plaintiff does not challenge the fact that the ability to meet the physical requirements of a Kansas City police officer is an essential eligibility requirement for being licensed as an armed security guard. However, Plaintiff vigorously challenges the Board's assumption that one-handed applicants cannot meet these physical standards. Plaintiff also asserts that a determination of who is "qualified" must include an analysis of whether reasonable modifications to the Board's policies or practices will allow a disabled individual to meet essential eligibility requirements.

In analyzing whether Plaintiff is "qualified," the Court will split its evaluation into three parts: a) the implications of the Rehabilitation Act; b) blanket exclusions under the ADA; and c) the regulations implementing Title II of the ADA.

### a. Implications of the Rehabilitation Act

█ Since the enactment of the ADA, relatively few courts have had the opportunity to interpret the provisions of Title II. However, because many of the legal principles and much of the language of the ADA is modeled after the Rehabilitation Act of 1973, past Rehabilitation Act interpretations are considered persuasive authority. *Peoples v. Nix,* No. 93–5892, 1994 WL 423856 (E.D.Pa. 1994); *Medical Society of New Jersey v. Jacobs,* 1993 WL 413016, at *6 (D.N.J.1993); *Easley v. Snider,* 841 F.Supp. 668, 672 (E.D.Pa.1993); *Conner v. Branstad,* 839 F.Supp. 1346, 1357 (S.D.Iowa 1993). By its terms, the Rehabilitation Act is limited to prohibiting handicap discrimination in programs that receive federal financial assistance. 29 U.S.C. §§ 791–794. However, the ADA extended the protections of the Rehabilitation Act to prohibit discrimination by state departments and agencies regardless of whether they receive federal funds. *Wolford v. Lewis,* 860 F.Supp. 1123, 1134 (S.D.W.Va. 1994); *Easley,* 841 F.Supp. at 672.

In their briefs, both sides rely on *School Board of Nassau County v. Arline,* 480 U.S. 273, 287, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987), the seminal Supreme Court decision construing the Rehabilitation Act. In *Arline,* the Supreme Court determined that the interests of individuals with disabilities must be balanced against legitimate concerns for public safety. However, the Court warned that, "[t]he determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability; it must be based on an individual assessment that conforms to the requirements of [28 C.F.R. § 36.208(c) ]." *Arline,* 480 U.S. at 287, 107 S.Ct. at 1131. Such an individualized inquiry is essential if the law is to achieve its goal of protecting disabled individuals from discrimination based on prejudice, stereotypes, or unfounded fear. *Id.* At bottom, *Arline* requires an individualized assessment of the safety risks posed by disabled individuals.

In this case, Plaintiff was given no individualized consideration by the Board. Plaintiff submits that he can safely handle both a revolver and a shotgun, has been trained in weapon retention and handcuffing, and can effectively apprehend suspects. The Board took none of this into account in making its licensing decision. Instead of allowing Plaintiff to prove his physical abilities, his application was summarily denied when the Board learned of his anatomical loss. Such a policy is contrary to the holding of *Arline.*

In fashioning their interpretation of the Rehabilitation Act, Defendants' rely on *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). In *Davis,* the Supreme Court upheld a college's decision to deny a plaintiff training as a registered nurse because she had a serious hearing disability and could not safely participate in the nursing program without substantial modifications. The case is easily distinguishable. Most importantly, in *Davis* the college made its determination only after the plaintiff was given an individual medical examination. *Id.* at 400–01, 99 S.Ct. at 2364–65. In the present case, Plaintiff was denied the opportunity for any individualized assessment. It is also important to note the *Davis* Court's admonishment that "the mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Davis,* at 405, 99 S.Ct. at 2366. As illustrated above, the relevant Rehabilitation Act precedents require individualized consideration for disabled individuals.

### b. Blanket Exclusions

█ An overriding question in this analysis is whether the Board may impose an across-the-board exclusion on all one-handed applicants by simply assuming that they cannot meet the physical eligibility requirements. Such an exclusionary policy is highly suspect. Courts have struck down similar blanket exclusions under the ADA. *See, e.g., Bombrys v. City of Toledo,* 849 F.Supp. 1210, 1216–19 (N.D.Ohio 1993) (blanket exclusion

preventing insulin-dependent diabetics from becoming police officers violated ADA); *Coleman v. Zatechka*, 824 F.Supp. 1360, 1372 (D.Neb.1993) (university's blanket policy prohibiting assignment of roommates to students with disabilities violated ADA); *Galloway v. Superior Court of the District of Columbia*, 816 F.Supp. 12, 19 (D.D.C.1993) (Title II of ADA violated by categorical exclusion of all blind persons from jury service). *See also, Anderson v. Little League Baseball, Inc.*, 794 F.Supp. 342, 344–45 (D.Ariz.1992).

Like the Rehabilitation Act, the ADA has been interpreted to require a case-by-case analysis of disabled individuals and the benefits or jobs they seek. *See, Bombrys*, 849 F.Supp. at 1216; *Anderson*, 794 F.Supp. at 345. A disabled individual may be denied the benefits or services of a public entity only if he or she poses a direct threat to the health or safety of others. 42 U.S.C. § 12182(b)(3). A "direct threat" is defined in the statute as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(b)(3). The Court does not question the goal of ensuring that all individuals who are licensed as armed security guards are able to safely conduct their duties. However, the Board presented no evidence to suggest that it conducted an individualized assessment and determined that Plaintiff poses a direct threat to the health or safety of others or himself. In fact, the Board asserts that no individual consideration is necessary.

The blanket exclusion of all one-handed license applicants because of an unfounded fear that they are dangerous and more likely to use deadly force clearly runs afoul of the individualized assessment required by the ADA. It is essential that disabled license applicants be given consideration on a case-by-case basis to *accurately* determine what risks, if any, they pose to themselves or the public. "An individualized assessment is absolutely necessary if persons with disabilities are to be protected from unfair and inaccurate stereotypes and prejudices." *Bombrys*, 849 F.Supp. at 1219. When permitted to impose physical requirements that categorically exclude certain classes of disabilities from licensing consideration with no regard for individual abilities, public entities undermine the basic purpose of the ADA. In summary, Plaintiff cannot be disqualified for a license merely on the assumption that he cannot perform the same physical tasks as a person with two hands. The appropriate inquiry by the Board must be limited to whether or not an applicant can perform the duties of a police officer, not whether the applicant has two hands.

### c. Implementing Regulations

The applicable regulations implementing Title II offer further assistance in determining if an individual is "qualified:"

> A public entity shall not impose or employ eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered.

28 C.F.R. § 35.130(b)(8). The Board has imposed eligibility criteria that automatically screens out all applicants, such as Plaintiff, who are missing a hand. Based on the above regulation, in order to justify such an across-the-board exclusionary policy, the Board must show this policy is "necessary" to adequately administer the licensing program. The Board's justification for its blanket rejection of one-handed applicants is that it is necessary to ensure safety.

The Court cannot rely solely on the fact that the Board claims two hands are necessary but must make an independent inquiry into the soundness of this policy. *Pandazides v. Virginia Board of Education*, 946 F.2d 345, 349 (4th Cir.1991) ("defendants cannot merely mechanically invoke any set of requirements and pronounce the handicapped applicant ... not otherwise qualified"); *Strathie v. Department of Transportation*, 716 F.2d 227, 231 (3d Cir.1983); *New York State Association for Retarded Children v. Carey*, 612 F.2d 644, 650 (1979) (mentally retarded children who were thought to be hepatitis carriers could not be excluded

from classrooms when health hazard was only a remote possibility). The Court finds that the Board cannot defend its screening mechanism as necessary to ensure safety. The bare fact that an applicant is missing a hand does not automatically mean he or she cannot safely use a firearm or meet the physical requirements of a police officer. Moreover, when reasonable accommodations are provided, the chances are even greater that a one-handed person will qualify for a license.

The Board correctly points out that a factual issue exists as to whether or not Plaintiff can physically meet the criteria required of a Kansas City police officer. However, the Court need not resolve this factual argument because a more important legal question takes precedence. Specifically, does the ADA require that Plaintiff have the opportunity to prove his individual abilities or is the Board permitted to assume, simply by virtue of his having only one hand, that Plaintiff is not capable of performing the tasks that two-handed applicants can? Put another way: should every individual with an anatomical loss be required to go to Court to prove his or her physical ability each time they need a license or is the Board required to allow for individual consideration of applicants as a matter of law? As demonstrated above, the ADA requires individual consideration.

It is important to note that Plaintiff is not asking the Board to lower its safety standards. He does not dispute the fact that he must meet the same standards as a Kansas City police officer. Plaintiff challenges the legality of the Board's rule that prohibits him from obtaining a license as an armed security guard solely because he has only one hand. He simply requests the opportunity to demonstrate that, despite his disability, he is capable of meeting those requirements or can do so with reasonable accommodations. The ADA guarantees him that equal opportunity. As currently formulated, the Board's licensing scheme never allows a disabled individual such as Plaintiff to prove he or she is "qualified." The Court finds as a matter of law that this program violates the ADA.

This decision will not cause great disruption or major changes in the Board's licensing program. The Court does not seek to overburden the Board in carrying out its important duties, however, appropriate modifications must be made in order to individually consider and accommodate disabled individuals.

## IV.  DUE PROCESS

As an alternative basis for its holding, the Court finds that the Board's licensing scheme violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Presumptions that irrebuttably determine that an individual is unqualified for a particular job violate the Due Process Clause. *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 644, 94 S.Ct. 791, 798, 39 L.Ed.2d 52 (1974) (mandatory maternity leave for public school teachers found to be unconstitutional); *Bombrys v. City of Toledo,* 849 F.Supp. 1210, 1217 (N.D.Ohio 1993) (city unlawfully excluded plaintiff from employment as a police officer solely because he was insulin-dependent diabetic). The Board's blanket prohibition on one-handed license applicants acts as an irrebuttable presumption that provides for too little process.

## V.  CONCLUSION

The Board's blanket disqualification of all armed security guard license applicants with the anatomical loss of a hand violates the ADA. Such a blanket disqualification also violates the Due Process Clause of the Fourteenth Amendment.

It is therefore ORDERED that Plaintiff's motion for partial summary judgment on his ADA claims is GRANTED. It is further

ORDERED that the Board's blanket exclusion of persons with the anatomical loss of a hand in its licensing procedures is hereby DECLARED unlawful. It is further

ORDERED that the Board is PERMANENTLY ENJOINED from imposing a blanket exclusion of persons with the anatomical loss of a hand from receiving licensing as armed security guards. It is further

ORDERED that the Board must modify its existing licensing procedures to allow for

the individualized assessment of disabled license applicants. It is further

ORDERED that as soon as is practicable the Board must make an individualized assessment of Plaintiff and allow him the opportunity to demonstrate that, with or without reasonable accommodations, he can meet the physical requirements of a Kansas City police officer. It is further

ORDERED that the Court will defer ruling on damage issues until the other counts of Plaintiff's complaint have been adjudicated.